# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

TYROLIA DEJUAN WILSON,

        Plaintiff,

        v.

SAINT FRANCIS MINISTRIES, INC.,

        Defendant.

Case No. 18-2027-CM

## MEMORANDUM & ORDER

Here, plaintiff Tyrolia Dejuan Wilson sues defendant Saint Francis Ministries, Inc. under the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 et seq., and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Plaintiff claims that defendant denied him both his ADA-given rights to work with a reasonable accommodation for his disability, within a non-hostile environment, and without retaliation, and his FMLA-given rights to take medical leave without interference or retaliation. Arguing that plaintiff cannot support those claims, defendant moves for summary judgment. Because the court agrees with defendant, but only in part, the court grants in part and denies in part Defendant's Motion For Summary Judgment (Doc. 60).

## I.    Background[1]

When plaintiff Tyrolia Dejuan Wilson applied to work as an Addictions Counselor for defendant Saint Francis Ministries, Inc., his application noted that he was an individual requiring accommodation.

---

[1] This section's facts are presented, as best the court can discern them from the limited record, in the light most favorable to plaintiff, the nonmovant, unless "blatantly contradicted." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 961 n.1 (10th Cir. 2017) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

An earlier spine injury had permanently disabled plaintiff. Resulting spinal stenosis, myoclonic jerks, muscle spasms, and migraines, when active, severely pained his low back, neck, shoulder, and head. This impaired his ability to maintain any prolonged seated or standing posture. And at least one medical professional later opined that a flare-up of these episodic conditions may render plaintiff unable to work and thus make it medically necessary for plaintiff to be absent during the flare-up. Despite his disabled condition, plaintiff requested no accommodation at the time of his July 2016 hiring.

When defendant offered the counselor position to plaintiff, it nonetheless afforded plaintiff certain accommodations. Unable to meet plaintiff's salary demands but able to accommodate his college schedule's demands, Debra McKenzie, then defendant's acting Director, offered to allow plaintiff to work a 32-hour-week schedule for 40-hour-week pay and benefits. Plaintiff accepted, marking July 2016 as his employment's beginning and $17.31 per hour as his salary's pay rate.

Over the next several months at work, plaintiff's condition started causing him more problems. Migraines occurred more frequently. At one point, plaintiff was taken by ambulance to the emergency room. These difficulties notwithstanding, by November 27, 2016, plaintiff earned a raise. Defendant raised plaintiff's salary from $17.31 to $17.84 per hour. Plaintiff complained, however, that this $0.47 per hour raise ignored the "12 years work experience" he had accumulated before defendant hired him. (Doc. 61-2, at 19.) Plaintiff therefore claimed defendant should have raised his pay rate to $21.53 per hour. Despite his requests, plaintiff never received his claimed pay rate.

The subject of plaintiff's work schedule came up again by December 2016 or January 2017. While discussing certain paid-time-off procedures with plaintiff, McKenzie mentioned that defendant may start requiring plaintiff to work 40-hour weeks. To address plaintiff's disability-based concerns with that possibility, McKenzie scheduled a meeting with plaintiff; herself; and Shannell Carroll-Douglas, one of defendant's Human Resources representatives. At that meeting, defendant asked

plaintiff to work six, 6-hour days for a total 36-hour work week. Plaintiff refused. He explained that he felt unable to commit to the proposed schedule's requirement that he work Saturdays, as that would leave him working alone and without the backup he might need should his disability cause him difficulty. In response, plaintiff was told to provide medical records. Plaintiff supplied records describing his diagnosis and its impact on his ability to work a rigid schedule. For example, a March 20, 2017 "Return to Work/School" note from plaintiff's physician remarks on plaintiff's need for "light duty" work that allows for frequent postural breaks.

Three days following that note, on March 23, 2017, another meeting occurred between plaintiff; Carroll-Douglas; and Garnetta King, the Lead Counselor (and, following a later promotion, Program Coordinator) responsible for supervising plaintiff. At that meeting, King presented plaintiff with a Performance Improvement Plan ("PIP"). As an area of concern in plaintiff's work performance, the PIP identified plaintiff's attendance. Specifically, the PIP criticized plaintiff for "[n]ot [m]eeting the required 40 hours/week." (Doc. 61-3, at 2.) The PIP outlined defendant's expectation that, within 30 days, plaintiff demonstrate improved attendance. By the PIP's terms, this required plaintiff to: "[m]eet[] 40 hrs/week," "communicate schedule w/ supervisor," "[g]ive doctor notes for anytime missed," "use outlook calendar," and submit to King's "[w]eekly supervision." (*Id.*) Plaintiff agreed to the PIP's terms, marking the first and only time he agreed to work a presented fulltime schedule.

Immediately after the PIP meeting's end, plaintiff confided directly to Carroll-Douglas that the PIP's terms and King's supervision worried him. Plaintiff recalls receiving no verbal warnings, write-ups, or other expressed concerns about his performance prior to this PIP. Plaintiff conveyed this to Carroll-Douglas and questioned the fairness of criticizing him for working the part-time hours McKenzie offered him at hiring. The PIP's supervision arrangement only added to plaintiff's unease. To Carroll-Douglas, plaintiff reported his feelings that, since his employment's beginning, King had been harassing

him.  Plaintiff feared that, under the PIP's supervision terms, King's harassing behavior would worsen. Though not plaintiff's intention to incite an investigation, Carroll-Douglas promised to investigate the reported harassment.

The harassment plaintiff reported then to Carroll-Douglas would not be the last.  In total, plaintiff felt harassed by King and others when:

- King assigned plaintiff work without first effectively training him in defendant's software and how to complete certain assignments.

- King afforded plaintiff a mere one-day notice to complete work for an audit, despite affording another counselor three-week's notice.

- King made "nasty and unprofessional comments" to plaintiff, (Doc. 61-2, at 9), like:
  - laughing at his questions and once questioning in return, "How are you a counselor," which plaintiff interpreted as "basically calling [him] dumb" (*Id.* at 10)
  - and laughing during his muscle spasms.

- King instigated a complaint that led to plaintiff receiving a write-up for "not being available to drive" the client van and not timely reporting the doctor's appointment that caused his alleged unavailability, even though the at-issue driving duty and doctor's appointment occurred hours before plaintiff's scheduled shift and others but "never" plaintiff drove the van for defendant. (*Id.* at 15.)

- King increased plaintiff's workload, at one summer of 2018 staff meeting, by reassigning other counselors' individual-session clients to him, leaving him responsible for 10 to 15 individual clients' paperwork.

- Carroll-Douglas "constantly" held meetings with plaintiff, after he reported his concern that King was harassing him. (*Id.* at 16.)

- Carroll-Douglas "demanded [plaintiff] provide medical documentation anytime that [he] was tardy." (Doc. 68-2, at 3.)

- Susan Montague, who replaced McKenzie as defendant's Director and also supervised plaintiff, dismissed plaintiff's question about the status of a raise he claimed by "getting smart" with him and stating, "That's why I'm never going to hire anybody with just an associate's [degree.]" (Doc. 61-2, at 25.)

Following the PIP meeting, Carroll-Douglas resolved one of plaintiff's concerns when she "basically made [King] train [plaintiff]." (*Id.* at 12.)  But overall, the balance of plaintiff's interactions with King, Montague, and Carroll-Douglas, made plaintiff feel "disrespected" and "targeted." (*Id.* at 10.)

Despite those feelings, plaintiff completed the PIP. Criticisms of plaintiff's punctuality, however, resurfaced. While at work on June 3, 2017, plaintiff suffered an injury. (Later, starting around February 19, 2018, plaintiff would make a workers' compensation claim for this injury.) In the weeks that immediately followed plaintiff's injury, leading up to July 7, 2017, King documented five instances of tardiness:

[June 12, 2017]:   [Plaintiff's] schedule is 11:00am–7pm. [Plaintiff] arrived at work at 11:10am[;] however[,] he signed in at 11:00am on sign in sheet.

[June 15, 2017]:   [Plaintiff] got here at 11:30am[;] and [when] asked about his doctor's appointment[,] he stated that his doctor would not see him. . . . [Plaintiff] contacted [his doctor] to get an excuse[,] and the lady stated someone can call and talk to her if there should be some questions why he was not seen. I sent an email to [Carroll-Douglas] in human resources to ask if that would be enough[;] she stated okay[.]

[June 16, 2017]:   [Plaintiff] sent an email stating he would be a little late[;] he just got out of therapy. [Plaintiff] called back at 11:01am to say he was hurting[,] and he wanted to soak before he came in[;] then[,] he asked if he could flex his time . . . . [Plaintiff] is scheduled to come in at 2pm due to night hoops[;] he didn't get here until 2:05pm.

[June 19, 2017]:   [Plaintiff] is scheduled for 11:00am[.] [A]ccording to my watch and computer time it was between 11:03am and 11:05am[;] however[,] he signed in at 11:00am. . . .

[June 28, 2017]:   [Plaintiff] called and stated he was going to get some medicine and change his key for his office at 3:05pm[.] [I]t is now 4:30pm[,] and he [is] not back yet.

(Doc. 61-4, at 2.) These issues earned plaintiff a written warning: "[plaintiff] needs to come to work as scheduled on time" and email when he is to be late or sick; otherwise, he will be subject to "[d]ischarge." (*Id.* at 3.) Still, during this time period, on June 25, 2017, defendant raised plaintiff's pay rate to $19.56 per hour. Again, plaintiff complained for but never received a higher pay rate and retroactive pay at that claimed rate.

Just shy of two months later, on August 2, 2017, defendant placed plaintiff on FMLA leave.

By that time, plaintiff's doctor had completed two FMLA certification forms. The first, completed July 19, 2017, focused on plaintiff's pain from muscle-aches and migraines. It certified that plaintiff was able to perform his job's functions; but it also certified that plaintiff's condition would require monthly appointments for medically necessary treatment and "may cause [plaintiff] to be unable to work" the day of any flare-ups. (Doc. 68-10, at 4–5.) In the second certification form, completed August 1, 2017, plaintiff's doctor listed no particular "condition for which the employee seeks leave" but did certify plaintiff's need to undergo that day a procedure requiring a follow-up appointment. (Doc. 68-11, at 3–4.) Plaintiff's doctor further certified that "[d]ue to medications," plaintiff was unable to perform any driving functions of his job. (*Id.* at 3.)

When plaintiff submitted the last of these forms on August 2, 2017, Shannell-Douglas advised plaintiff that "[he's] now on FMLA leave" and "to contact [defendant] in the morning by phone." (Doc. 61-2, at 22.). Nothing shows that phone call ever occurred. Plaintiff remained on unpaid leave—"basically suspended," (*Id.* at 24), to borrow his words—for about the next two-and-a-half weeks, until he "tried to get short-term disability." (*Id.* at 22.) At that point, defendant contacted plaintiff about his preference on coming back to work. Once plaintiff's doctor provided documentation that he was fit to return to work, defendant took plaintiff "off FMLA all together." (*Id.*) (Later, on October 3, 2017, plaintiff would file with the Kansas Human Rights Commission and U.S. Equal Employment Opportunity Commission a charge against defendant of ongoing disability-based discrimination and retaliation, listing: this August 2017 incident of unpaid leave; the written warning for tardiness he received July 7, 2017; the PIP concerning poor attendance he received March 23, 2017; and the schedule-change meeting that occurred around December 2016 or January 2017.) Plaintiff resumed work August 18, 2017.

One week later, on August 25, 2017, plaintiff's "intermittent leave began." (Doc. 61-8, at 2.) Plaintiff exhausted the remaining 384 of his 480 FMLA-allotted leave hours by April 29, 2018. A May 3, 2018 letter and in-person meeting notified plaintiff of his FMLA leave's exhausted status. About two months later, on June 26, 2018, plaintiff requested a leave of absence spanning June 25 to July 16. Plaintiff specified the type of leave he was requesting as being leave "[f]or [his] own medical care" and an "[o]ther" reason. (Doc. 68-5, at 2.) For the "other" reason, plaintiff wrote: "I just lost my mother[,] having physical and emotional issues." (*Id.*) Elsewhere on the request form, as the reason for his leave request, plaintiff wrote: "Mother passed away, Need to handle her affairs, having cluster migraines." (*Id.*) Explaining that plaintiff had already exhausted his allotted FMLA hours for the relevant 12-month period, defendant denied plaintiff's leave request. Around this time, specifically on June 24, 2018, defendant raised plaintiff's pay rate to $20.40 per hour.

Plaintiff worked his last day for defendant in November 2018. On November 26, 2018, plaintiff applied for short-term disability benefits. Since that day, plaintiff has been unable to work for defendant as an Addictions Counselor.

## II. Standards

### A. Proceeding Pro Se

Before turning to defendant's arguments, the court would note that plaintiff represents himself. That entitles plaintiff's filings to "a liberal reading." *Abdullhaseeb v. Calbone*, 600 F.3d 1301, 1310 (10th Cir. 2010). Plaintiff's pro se status, however, does not "excuse [him] from following the strict requirements of Rule 56 in order to properly contest a summary judgment motion." *Schlecht v. Lockheed Martin Corp.*, 626 F. App'x 775, 778–79 (10th Cir. 2015) (citing *Abdullhaseeb*, 660 F.3d at 1310). Nor does it empower this court to "act as [his] advocate." *Ford v. Pryor*, 552 F.3d 1174, 1178 (10th Cir. 2008).

## B. Summary Judgment Review Standard

To earn summary judgment, defendant, as the moving party, must show that genuinely undisputed facts entitle it, as a matter of law, to judgment. Fed. R. Civ. P. 56(a). Once defendant shows that some legally material fact is absent, plaintiff, as the nonmoving party, bears the burden to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted). The court credits plaintiff's evidence and any reasonable accompanying inferences. *Id.* at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). But still, to create a "genuine," trial-worthy dispute, plaintiff must support his factual position with more than his pleading's allegations and a scintilla of evidence. *Id.* at 266. He instead must produce such admissible evidence "that a reasonable jury could return a verdict for [him]." *Id.* at 248.

## III. Plaintiff's ADA Claims

The ADA prohibits covered employers, like defendant, from subjecting qualified employees to disability-based discrimination and retaliation. 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability . . . ."); *Id.* § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter. . . ."). Disability-based discrimination encompasses failure-to-accommodate and hostile-work-environment claims. *Id.* § 12112(b)(5)(A) (defining disability-based discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"); *Lanman v. Johnson Cty.*, 393 F.3d 1151, 1155–56 (10th Cir. 2004) ("[W]e hold that a hostile work environment claim is actionable under the ADA"). Here, plaintiff claims that defendant denied him his ADA-given rights to work with a reasonable

-8-

accommodation for his disability and within an environment free of harassment and retaliation. The produced evidence allows this court to both agree and disagree.

### A. ADA Failure to Accommodate

Plaintiff's failure-to-accommodate claim requires evidence that:

(1) he is a qualified individual with a disability;

(2) he requested a plausibly reasonable accommodation for his disability;

(3) defendant was aware of his disability at the time of the accommodation request; and

(4) defendant failed to reasonably accommodate the disability.

*See McFarland v. City & Cnty of Denver*, 744 F. App'x 583, 586 (10th Cir. 2018) ("[Plaintiff-employee's] prima facie burden requires her to show (1) she is a qualified individual with a disability, (2) the [employer] was aware of her disability, and (3) the [employer] failed to reasonably accommodate the disability."); *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017) ("[T]he employee must make an initial showing that '(1) she is disabled; (2) she is "otherwise qualified;" and (3) she requested a plausibly reasonable accommodation.'"). The opening burden of supporting those prima facie elements with admissible evidence belongs to plaintiff. *Punt*, 862 F.3d at 1050. If and only if plaintiff produces such evidence, defendant bears the burden to conclusively rebut one or more of plaintiff's prima facie elements with its own admissible evidence. *Id.* If that occurs, then plaintiff bears the closing burden to rehabilitate his prima facie case. *Id.*

Here, plaintiff meets his opening burden. Defendant's burden to conclusively counter plaintiff's case, however, requires more than defendant offers.

Before the court addresses what the parties offer in support of their respective burdens, however, it feels compelled to address what neither party offers. Neither party makes any serious effort to define or substantiate the essential functions of plaintiff's counselor position. This is not insignificant. To be a "qualified individual," plaintiff need show himself capable, with or without accommodation, of

performing his position's essential functions. 29 C.F.R. § 1630.2(m). As such, determining which functions are essential to plaintiff's position is critical to determining whether plaintiff is qualified. *Mason v. Avaya Comms., Inc.*, 357 F.3d 1114, 1124 (10th Cir. 2004) (quoting 29 C.F.R. § 1630 App. at 355."). Particularly if not qualified without accommodation, the determination of which functions are essential is critical to determining whether a requested accommodation is reasonable. *See id.* at 1123 ("[A] requested . . . accommodation is unreasonable when the accommodation eliminates an essential function of the job."). Here, nothing the parties present enables the court to determine conclusively any of the essential functions of plaintiff's counselor position.[2] *C.f.* 29 C.F.R. § 1630.2(n) (listing a variety of nonexclusive considerations that inform whether a particular job function is essential). In particular, the parties ill-equip the court to determine whether defendant in-practice treated perfect punctuality and fulltime attendance as essential.[3] The result: more facts "*might* affect the outcome of the suit under the governing law;" so, fewer footholds exist to discount factual disputes concerning the initial two prima

---

[2] Plaintiff comes the closest. He submits an FMLA certification form that seemingly includes, as an attachment, an "Associated Youth Services Job Description." (*See* Doc. 68-4, at 6–7.) But neither party mentions—let alone interprets— this document in its arguments. That lack of guidance from the parties leaves this court able to *guess at* but unable to *determine* the essential/"fundamental" or nonessential/"marginal" character of the functions listed. *See* 29 C.F.R. § 1630.2(n) ("The term essential functions means the fundamental job duties of the employment position," and "does not include the marginal functions of the position.") "Th[is] court should not be left to its own guesswork." *Haehn v. City of Hoisington*, No. 86-1279-C, 1988 WL 131644, at *3 (D. Kan. Nov. 18, 1988)

[3] This court is aware that "regular attendance may fairly be characterized as an essential function of some jobs," and that for such jobs, it would be unreasonable to accommodate "irregular and unpredictable attendance." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1146–47 (10th Cir. 2011); *see also Crowell v. Denver Health & Hosp. Auth.*, 572 F. App'x 650, 659 (10th Cir. 2014) ("[A]n unpredictable, flexible schedule that would permit [an employee] to leave work whenever []he has a medical episode is unreasonable as a matter of law."). This court also is aware that "the essential function inquiry is not [necessarily] conducted as of an individual's hire date" but instead as of "the time [the function] was imposed." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009). Still, whether a particular function is essential requires a case-by-case factual determination. *Mason v Avaya Comms., Inc.*, 357 F.3d 1114, 1124 (10th Cir. 2004). Defendant presents neither evidence nor argument that it actually treated perfect punctuality and fulltime attendance as essential. Post-accommodation-request paperwork referring to the position as "Full Time" and documents criticizing plaintiff's attendance are contrasted with sworn statements from plaintiff that, prior to his accommodation request, defendant in fact afforded plaintiff a less-than-fulltime work schedule. Also noteworthy, the only purported job description for plaintiff's position lists no punctuality, attendance, or minimum work schedule requirements. Accordingly, this court is not positioned to conclude that plaintiff's imperfect attendance record: (1) proves he could not perform his position's essential functions with or without any reasonable accommodation and thus (2) disproves he is a "qualified individual."

facie elements as "irrelevant or unnecessary." *Anderson*, 477 U.S. at 248 (emphasis added). Simply put, here, the burden to show entitlement as a matter of law to judgment becomes more burdensome.

### 1. *Plaintiff is a qualified individual with a disability.*

By stipulation, both parties agree that plaintiff is disabled. (*See* Doc. 56, at 2.) Defendant, however, disagrees that plaintiff is a "qualified individual"—again, an individual who "with or without reasonable accommodation, can perform the essential functions of [the] position." 29 C.F.R. § 1630.2(m). To support its argument that plaintiff cannot perform the essential functions of his counselor job, either with or without accommodation, defendant offers only these stipulated facts:

- Due to [p]laintiff's disability, he cannot perform the essential functions of his job.

- Plaintiff has been unable to work since at least November 26, 2018, as specified in his application for short term disability.

- Plaintiff's disability prevents him from being able to work and fulfill the duties of his job with [d]efendant at this time.

- Plaintiff is unable to perform the duties of his job with [d]efendant with or without accommodation, and does not know when he will be able to in future.

(Doc. 56, at 2.)

This evidence, however, proves less than defendant claims. This court reads liberally plaintiff's stipulations in the light that favors him—a self-represented nonmovant—best. *Abdullhaseeb*, 600 F.3d at 1310; *Anderson*, 477 U.S. at 255. So read, plaintiff's stipulations show only that since at least November 26, 2018, no accommodation has enabled or even could enable him to perform the essential functions of his counselor position.[4] But "[t]he determination of whether an individual with a disability

---

[4] That reading is consistent with plaintiff's claim that he "was considered a qualified individual *prior to* the conduct he had to endure from [d]efendant." (Doc. 68, at 1 (emphasis added).) "Of course, [plaintiff's] subjective assessment of the situation is not dispositive. But his [statement] does at least reinforce [the court's] conclusion." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 898 n.5 (10th Cir. 2017).

is qualified is to be made *at the time of the [challenged] employment decision*."[5] *Section 1630.2(m) Qualified Individual*, Appendix to Part 1630—Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. § 1630.2, App. (emphasis added); *see also Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1147 (10th Cir. 2011). Here, the court must ask whether plaintiff could perform the counselor position's essential functions at the time he claims defendant failed to reasonably accommodate him—that is, around the December 2016 or January 2017 schedule-change and March 2017 PIP meetings where defendant proposed changing his work schedule.

No evidence before the court shows that, around that December 2016 to March 2017 period, plaintiff was unable to perform his counselor position's essential functions.[6] In fact, evidence shows that defendant raised plaintiff's salary on three occasions, once preceding and twice following the at-issue meetings. This evidence reasonably justifies an inference that plaintiff generally was performing his position's essential functions satisfactorily. At this stage, that inference deserves this court's credit, notwithstanding any contrary evidence that defendant later sought improved punctuality and attendance from plaintiff.[7] *See Anderson*, 477 U.S. at 255 (identifying the "weighing of evidence" as a jury function and not a judge's responsibility when ruling on a motion for summary judgment).

---

[5] This same logic undermines defendant's related argument that plaintiff's ADA claims do not square with statements made in his November 26, 2018 short-term disability and post-February 2019 long-term disability applications. To begin, such statements "cannot be an *automatic* bar to a disability discrimination claim under the ADA;" they simply "*may* . . . constitute evidence relevant to [determining] whether the plaintiff is a 'qualified individual with a disability.'" *Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1332 (10th Cir. 1998) (emphasis added). But here, statements in those applications suggesting that plaintiff *presently* is unable to perform his position's essential functions are irrelevant, as proving plaintiff's ADA claims depends on his abilities at challenged moments *earlier* in his employment.

[6] As noted, omissions by the parties impact the court's "essential functions" inquiry. In turn, this prevents the court from determining conclusively as a matter of law that plaintiff is not qualified, with or without reasonable accommodation. *See supra* notes 2 and 3.

[7] *See supra* note 3.

-12-

### 2. *Plaintiff requested a plausibly reasonable accommodation.*

"Reasonable accommodation may include . . . part-time or modified work schedules." 29 C.F.R. § 1630.2(o)(2)(ii); *see also Carter*, 662 F.3d at 1146. Defendant acknowledges that "[p]laintiff sought an accommodated work schedule." (Doc. 61, at 12.) That leaves the question: was plaintiff's request reasonable? The answer is yes, if plaintiff could perform his job's essential functions while working only the requested part-time or modified schedule.[8] *Carter*, 662 F.3d at 1146 ("[A]n employee who proposes this accommodation may only prevail in an ADA action if he can demonstrate that he could perform the essential functions of his job while working part-time.").

Evidence supports that showing. As discussed above, defendant awarded plaintiff three raises. Plaintiff received the first of these raises when, facts viewed in his favor, defendant was affording him a less-than-fulltime work week to accommodate his school schedule.[9] This evidence reasonably justifies two important inferences. First, even when working a fewer-than-40-hour week, plaintiff was performing his position's essential functions satisfactorily. Second, if defendant could afford plaintiff a reduced schedule to accommodate his college-attendance needs, it reasonably could afford plaintiff's disability the same accommodation. That last inference, of course, assumes that, at the time of plaintiff's request, defendant's business needs remained unchanged. But defendant offers nothing to show that the reduced schedule once afforded plaintiff became an unduly burdensome and, thus, unreasonable accommodation. *See* 29 C.F.R. § 1630.9(a) (excusing any employer's failure to make a reasonable accommodation if it "can demonstrate that the accommodation would [have] impose[d] an undue

---

[8] Here too, omissions by the parties impede the court's ability to determine conclusively as a matter of law that plaintiff is not qualified, with or without reasonable accommodation. *See supra* notes 2 and 3.

[9] Notably, defendant presents no evidence "blatantly contradict[ing]" plaintiff's sworn statements that Debra McKenzie, then defendant's acting Director, initially afforded him a reduced schedule. *See DePaula*, 859 F.3d at 961 n.1 (quotation omitted). In fact, defendant presents plaintiff's testimony on this point as fact for the purposes of summary judgment. (*See* Doc. 61, at 2 n.1 and 4.)

hardship on the operation of its business."); *Id.* at § 1630.2(p) (defining "undue hardship"); *Boykin v. ATC/VanCom of Colo., L.P.*, 247 F.3d 1061, 1064 (10th Cir. 2001) ("If the plaintiff can make a facial showing that accommodation is possible, the employer must then show it is unable to provide accommodation to avoid liability . . . ."). Indeed, the new schedule defendant offered plaintiff was itself a reduced, 36-hour schedule. Accordingly, defendant fails to rebut prima facie evidence that a reduced or modified schedule of the type plaintiff requested was plausibly reasonable.

### 3. *Defendant knew of plaintiff's disability at the time plaintiff requested accommodation.*

Defendant received notice of plaintiff's disability at his employment's outset. Plaintiff's application to work for defendant noted that he was a disabled individual requiring—though not necessarily yet requesting from defendant—accommodation. In September 2016, a few months after plaintiff's hiring, plaintiff's disability forced him to leave work, by ambulance, for the emergency room. When months later defendant met with plaintiff to discuss plaintiff's work schedule, it did so fully aware of plaintiff's disability. This unrebutted evidence satisfies plaintiff's burden.

### 4. *Defendant failed to reasonably accommodate plaintiff's disability.*

Defendant argues that it satisfied its reasonable-accommodation duty by offering plaintiff a six-hour-day, six-day-a-week work schedule that plaintiff refused. But the ADA does not simply require that defendant offer accommodation; it requires that defendant's offered accommodation result from an interactive process.

If reasonable accommodation is the ADA's desired end, then its desired means is the interactive process. The interactive process "requires participation by both parties." *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004) (quotation omitted). Responsibility for initiating the process generally belongs to the disabled individual, who must "inform the employer that an accommodation is needed." *Section 1630.9 Not Making Reasonable Accommodation*, Appendix to Part 1630—Interpretive

Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. § 1630.2, App; *see also Bartee*, 374 F.3d at 916. At that point, both parties must "proceed in a reasonably interactive manner." *Bartee*, 374 F.3d at 916 (quotation omitted). Working together, the parties should "identify the precise limitations resulting from the [employee's] disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). Both employer and employee are obliged to communicate in good faith. *Bartee*, 374 F.3d at 916. Good-faith communication is lacking where a party makes unreasonable efforts "to help the other party determine what specific accommodations are necessary." *McFarland v. City & Cty. of Denver*, No. 15-CV-1258-KMT, 2017 WL 3872639, at *6 (D. Colo. Sept. 5, 2017) (quotations omitted). If no reasonable accommodation results from the dialogue, "responsibility will lie with the party that caused the breakdown." *Id.*

Here, prima facie evidence shows defendant caused the interactive process' breakdown. The breakdown might have been attributable to plaintiff had he simply refused defendant's proposed work schedule without further word. But the presented evidence shows something more. Plaintiff accompanied his refusal with expressed concern that the proposed schedule would force him to work more hours, and some of them alone and without the support of other staff he might need should his disability cause him difficulty. Following the meeting, plaintiff provided medical records describing his disability and its impacts. The interactive process required defendant to do more, in response, than simply default plaintiff to a standard 40-hour work week. The interactive process required defendant to consult further with plaintiff to ascertain "the precise job-related limitations imposed by [his] disability and how those limitations could be overcome." *Section 1630.9 Process of Determining the Appropriate Reasonable Accommodation*, Appendix to Part 1630—Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. § 1630.2, App.; *see also Valdez v. McGill*, 462 F. App'x 814, 819 (10th Cir. 2012) ("An employer must make a reasonable effort to explore the accommodation possibilities

with the employee.").  Following that conversation, defendant needed to either propose a work schedule that could accommodate plaintiff's disability-based concerns or, if not, justify its failure with proof that accommodating plaintiff would unduly burden its business operations. *See Bartee*, 374 F.3d at 916 (affirming denial of employer's motion for judgment as a matter of law where evidence showed employer offered inadequate accommodations and failed to inquire further about disabled employee's "restrictions or . . . the accommodations that he needed to perform his position.").  A plaintiff-favoring view of the limited, presented record shows that these interactive-process essentials never occurred.  Accordingly, unrebutted evidence satisfies plaintiff's fourth and final prima-facie burden.

Showing no genuinely undisputed, judgment-entitling facts, defendant's motion for summary judgment on plaintiff's failure-to-accommodate claim is denied.

### B.  ADA Hostile Work Environment (Harassment)

Plaintiff's hostile work environment, or harassment, claim is another matter.  That claim requires evidence that:

(1) plaintiff is a qualified individual with a disability;

(2) defendant subjected plaintiff to unwelcome harassment;

(3) the harassment was disability-based; and

(4) the harassment was so severe or pervasive that it altered a term, condition, or privilege of plaintiff's employment.

*Callahan v. Commc'n Graphics, Inc.*, 657 F. App'x 739, 746–47 (10th Cir. 2016).  Here too, a burden-shifting analysis applies.  But that analysis' details need no comprehensive review, as the opening burden—substantiating a prima facie case—never shifts past plaintiff.  *See Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896–97 (10th Cir. 2017).

Plaintiff's complaints are many. (*See, e.g.*, Doc. 56, at 5–7.) Most of these many complaints, however, are too unexplained and unsupported to create any genuine factual dispute. *See Ewing v.*

*Doubletree DTWC, LLC*, 673 F. App'x 808, 814 (10th Cir. 2016) ("'[C]onclusory statements unsupported by examples' do not suffice to create a genuine issue of material fact."); *Callahan*, 657 App'x at 747 ("[M]ere allegations without supporting evidence are not sufficient to survive summary judgment."); *Schlecht*, 626 F. App'x at 779 ("To oppose summary judgment, [pro se plaintiff] was required to do more than provide h[is] conclusory assertions or subjective interpretation of the evidence; []he was required to present admissible evidence of material fact.").

What remains of plaintiff's many complaints—the specific incidents outlined in the above Background section involving King, Carroll-Douglas, and Montague—at best, adds up to only nonactionable "general harassment" of the type discussed in *Williams*, 849 F.3d at 897. The evidence here, as in *Williams*, "[a]t most . . . shows that [plaintiff] struggled under a heavy workload, that he received no relief when he asked for help, and that he experienced mistreatment by and disciplinary action from his supervisors." *Id.* Arguably, however, the evidence here shows even less. The increase to plaintiff's workload was limited to a one-time reassignment of clients, as opposed to the realignment of sales territory that indefinitely "doubled [Williams'] workload." *Id.* at 893. Plaintiff *did* receive help addressing his lack-of-training complaints, while Williams' supervisors "ignored or denied" his requests for help. *Id.* at 897. And plaintiff, unlike Williams, alleges no threats being made against him. *Id.* The atmosphere created by this sort of adversity, however viewed, lacks the objectively severe or pervasive quality necessary to deem plaintiff's work environment "permeated with discriminatory intimidation, ridicule, and insult." *Id.* (quotation omitted); *see also Thomas v. Avis Rent a Car*, 408 F. App'x 145, 156 (10th Cir. 2011) ("'the environment must be both subjectively and objectively hostile or abusive,'" to support a hostile work environment claim).

This means the undisputed evidence lacks facts legally material to plaintiff's hostile work environment claim. As such, that claim is not trial-worthy, and summary judgment on this claim must be for defendant.

### C. ADA Retaliation

The same can be said for plaintiff's ADA-based retaliation claims. A retaliation claim made under the ADA requires evidence that:

> (1) plaintiff engaged in protected opposition to discrimination;
>
> (2) plaintiff's employer subsequently took some action that a reasonable employee would have found materially adverse; and
>
> (3) plaintiff's protected activity and the employer's action are causally connected.

*Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018). As before, a burden-shifting analysis guides this court's review. And as before, that analysis' details need no comprehensive review here, as the opening burden—substantiating a prima facie case—never shifts past plaintiff. *See id.* at 1192, 1209 ("[T]he *McDonnell Douglas* burden-shifting framework applies," requiring, at its first step, "plaintiff to establish a prima facie case.")

Plaintiff claims that defendant unlawfully retaliated against him for:

> 1. "Requesting reasonable accommodation of a disability."
>
> 2. "Declining to alter schedule from 5 days to 6 days a week (in an effort of accommodation for disability)."
>
> 3. "Filing an EEOC charge, complaint, investigation or lawsuit."
>
> 4. "Communicating with a supervisor or manager about employment discrimination, including harassment."
>
> 5. "Asking managers or co-workers about salary information to uncover potentially discriminatory wages."
>
> 6. "Filing Workers' Compensation claim."

(Doc. 56, at 5.) Each of these claims has its own prima facie defects.

Claims 1 and 2 lack supporting evidence of any causal connection. Plaintiff claims that defendant retaliated against him for his actions at the December 2016 or January 2017 schedule-change meeting by placing him on the March 23, 2017 PIP and issuing him the July 7, 2017 written warning. To causally connect these actions, plaintiff must present "evidence of but-for causation . . . based on more than mere speculation, conjecture, or surmise." *Lincoln*, 900 F.3d at 1209 (quotation omitted). Evidence the protected activity and retaliatory conduct occurred "very close in time" can create a presumption of causation. *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011). But "[a] three-month period, standing alone, is insufficient to establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). That means, without "additional evidence beyond temporal proximity," the roughly three-month period between the schedule-change meeting and the PIP and the roughly six-month period between the schedule-change meeting and the written warning do not meet plaintiff's burden of proving causation. *C.R. England, Inc.*, 644 F.3d at 1051–52. That temporal proximity, however, is plaintiff's best and only evidence. Lacking any evidence of but-for causation beyond temporal proximity and his own conjecture, claims 1 and 2 state no trial-worthy claim for retaliation.

As to claims 3, 4, and 5, plaintiff fails to specify, let alone substantiate with supporting evidence, any materially adverse subsequent action taken by defendant. In turn, this leaves the court without the reference points needed to evaluate the requisite causal connection. The closest plaintiff comes with any of these theories is alleging that, after he reported his concern that King was harassing him, Carroll-Douglas had him in meetings "constantly." (Doc. 61-2, at 16.) But plaintiff offers no further evidence of the nature, timing, and frequency of these meetings to show that holding these meetings "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Winston v. Ross*, 725 F. App'x 659, 665 (10th Cir. 2018) (quoting *BNSF Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). These deficiencies "grievously (if not fatally) undercut [plaintiff's] efforts to survive summary

judgment." *Sorenson v. Campbell Cty. Sch. Dist.*, 769 F. App'x 578, 586 (10th Cir. 2019) (reasoning that plaintiff's "failure to specify the nature of the protected activity" negated any "arguable foundation for the court to reasonably infer" the remaining prima facie elements). As such, claims 3, 4, and 5 state no trial-worthy claim for retaliation.

Claim 6, the last of plaintiff's alleged ADA retaliation claims, in fact involves no ADA-protected activity. The ADA prohibits discrimination against any individual "because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). Filing a worker's compensation claim, however, does not oppose any ADA-prohibited act or practice; it does not amount to an ADA charge; nor is it a form of testimony, assistance, or participation in an ADA investigation, proceeding, or hearing. And while, under *Kansas*'s retaliatory discharge law, "the filing of a [workers' compensation] claim is protected activity," the filing here bears no "causal connection" to the complained-of employment decision. *Proctor v. UPS*, 502 F.3d 1200, 1212 (10th Cir. 2007) (quoting *Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juvenile Det. Facility*, 101 P.3d 1170, 1177 (Kan. 2004)). Defendant placed plaintiff on unpaid FMLA leave starting August 2, 2017. But the record shows defendant first received notice of plaintiff's workers' compensation claim by letter dated February 19, 2018. Because the complained-of employment decision predates the protected activity, the two events bear no logical causal connection. And even if evaluated from the June 3, 2017 date of plaintiff's workplace injury, the three-month lapse between that injury and the complained-of employment decision "is not sufficient to show the prima facie element of causation." *Dewell v. Kan. Bar Ass'n*, No. 98,686, 2008 WL 4471866, at *1–*2 (Kan. App. Oct. 3, 2008). Plaintiff's sixth theory, therefore, also states no trial-worthy claim for retaliation under either the ADA or Kansas law.

Because plaintiff's presented case for ADA retaliation lacks necessary support, summary judgement on these claims must be for defendant.

## IV.    Plaintiff's FMLA Claims

The FMLA entitles eligible employees unable to perform their position's functions because of a "serious health condition"[10] "to a total of 12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1)(D).  Any employer who retaliates for or interferes with an employee's exercise of this right acts unlawfully. *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002) ("Courts have recognized two theories for recovery on FMLA claims under [29 U.S.C.] § 2615, the retaliation or discrimination theory and the entitlement or interference theory."); *Murphy v. Samson Res. Co.*, 525 F. App'x 703, 707 (10th Cir. 2013) ("'The FMLA makes it unlawful for an employer to retaliate against an employee for exercising her rights to FMLA leave.'"); *Nebeker v. Nat'l Auto Plaza*, 643 F. App'x 817, 822 (10th Cir. 2016) ("An employer may not 'interfere with, retrain, or deny the exercise of or the attempt to exercise, any right provided' under the FMLA. 29 U.S.C. § 2615(a)(1).")  Here, plaintiff claims defendant: (1) retaliated against him for his August 2017 leave request by placing him on unpaid leave

---

[10] The court is mindful that the "ADA's 'disability' and FMLA's 'serious health condition' [concepts] are different . . . and must be analyzed separately." 29 C.F.R. § 825.702(b).  But the ADA and, to some degree, FMLA both involve an inquiry into the employee's ability to perform his position's functions. *See id.* at § 1630.2(m)–(n) (defining, for purposes of ADA, "qualified" individual and "essential functions"); *id.* at § 825.123(a) (incorporating the ADA's definition of "essential functions" into one facet of the FMLA's definition of "unable to perform the functions of the position").  And here, on the presented record, the court sees no inconsistency between plaintiff's status as a qualified individual with a disability under the ADA and his undisputed status under the FMLA as an individual entitled to leave "[b]ecause of a serious health condition that makes [him] unable to perform the functions of [his] position." *Id.* at § 2612(a)(1)(D).

The presented evidence plausibly supports both determinations.  Under the ADA, plaintiff may be able to perform his position's functions with reasonable accommodation in the form of a part-time or modified work schedule.  And still, under the FMLA, plaintiff's condition may make him unable to perform those same job functions working an ordinary schedule, thus qualifying him for leave, which may take the form of leave "taken intermittently or on a reduced leave schedule." *Id.* at § 825.202(a). The regulations illustrate a similar ADA-FMLA interplay involving "[a] qualified individual with a disability who is also an eligible employee entitled to FMLA leave:" "Once the employee has exhausted his or her remaining FMLA leave entitlement working the reduced (part-time) schedule, if the employee is a qualified individual with a disability, and if the employee is unable to return to the same full-time position at that time, the employee might continue to work part-time as a reasonable accommodation, barring undue hardship." *Id.* at § 825.702(c)(2)–(3).

for nearly three weeks, and (2) interfered with his right to leave by denying his June 26, 2018 request for a leave of absence after his mother's death. Both claims lack needed evidence.

## A. FMLA Retaliation

An FMLA retaliation claim requires evidence that:

(1) plaintiff engaged in protected activity;

(2) defendant took some action a reasonable employee would have found materially adverse; and

(3) plaintiff's protected activity and defendant's action are causally connected.

*Dewitt v. S.W. Bell Tele. Co.*, 845 F.3d 1299, 1318–19 (10th Cir. 2017). An initial burden to substantiate this prima facie case belongs to plaintiff. *Id.* ("[r]etaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas*," under which "plaintiff bears the initial burden of establishing a prima facie case of retaliation" (quotations omitted)). Plaintiff's prima facie case, however, lacks evidence of any materially adverse action.

Plaintiff fails to show that defendant gave him anything other than the leave he requested.

Plaintiff submitted two FMLA certification forms in the weeks preceding the complained-of leave. Neither certification form designates plaintiff's requested leave as either "continuous" or "intermittent."[11] When plaintiff submitted the last of these forms, defendant placed plaintiff on unpaid FMLA leave. That leave continued about three weeks, until plaintiff's attempt to get short-term disability prompted defendant to contact plaintiff about his desire to come back to work. Plaintiff complains about the length and unpaid nature of the leave given him.

---

[11] Under the FMLA, leave may be "continuous" if taken as "one block . . . of twelve weeks or less." *Crowell*, 572 F. App'x at 655 n.7 (citing 29 U.S.C. § 2612(a)(1)). "FMLA regulations define 'intermittent leave' as 'FMLA leave taken in separate blocks of time due to a single qualifying reason.'" *Id.* at 655 n.6 (quoting 29 C.F.R. § 825.202(a)).

As to the leave's length, plaintiff complains that he requested "intermittent" leave. But neither certification form specifies the type of leave requested. And, in actuality, the leave given plaintiff qualifies as "intermittent leave." *See Winne v. City of Lakewood*, 436 F. App'x 840, 842 (10th Cir. 2011) ("Indeed, 'intermittent leave' . . . may include leave of periods from an hour or more to several weeks.' [29 C.F.R.] § 825.202(c)(1).").  Even if construed as an involuntary placement on FMLA "continuous" leave, "such forced leave, by itself, does not violate any right provided by the FMLA." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174–75 (2nd Cir. 2006); *see also Degra v. Exide Tech.*, 744 F. Supp. 2d 1199, 1214–15 (D. Kan. 2010) (citing *Sista* as support for the proposition that "there is no cause of action under the FMLA for forcing an employee to take FMLA leave.")

As to the leave's unpaid nature, "the FMLA does not guarantee *paid* leave." *Dulany v. Brennan*, 736 F. App'x 199, 203 (10th Cir. 2018) (emphasis original).  "Generally, FMLA leave is unpaid leave." 29 C.F.R. § 825.207(a).  And plaintiff fails to show that any of defendant's policies otherwise entitled him to substitute accrued paid leave for the unpaid FMLA leave given him. *See id.* ("FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave. . . .  An employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy.")

"[U]nder the undisputed facts," therefore, "[defendant] provided [plaintiff] with the leave to which he was (or may have been) entitled;" because a reasonable employee would not find this situation materially adverse, plaintiff shows "no interference or retaliation with [plaintiff's] requesting or taking of FMLA leave."[12] *Valdez*, 462 F. App'x at 819–20.

---

[12] Plaintiff characterizes this claim as one for retaliation.  But plaintiff claims an adverse action that predates his return to work, meaning his claim may instead be cognizable as an interference claim. *See Dalpiaz v. Carbon Cty*, 760 F.3d 1126, 1132 (10th Cir. 2014) ("[A]n interference claim arises when an adverse employment decision is made before the employee has been allowed to take FMLA leave or while the employee is still on FMLA leave."); *Valdez v. McGill*, 462 F.

### B. FMLA Interference

An FMLA interference claim requires evidence that:

(1) plaintiff was entitled to FMLA leave;

(2) defendant took some adverse action that interfered with plaintiff's right to take FMLA leave; and

(3) defendant's adverse action related to plaintiff's exercise or attempted exercise of his FMLA rights.

*DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 978 (10th Cir. 2017). Because an employer violates this FMLA-given right no matter its intent, the *McDonnell Douglas* burden-shifting analysis does not apply. *Id.* Still, though, plaintiff must produce evidence satisfying his interference claim's first two prima facie elements. *See Dalpiaz v. Carbon Cty*, 760 F.3d 1126, 1132 (10th Cir. 2014) (placing an initial burden on the employee to "demonstrate that the first two elements of interference are satisfied"). Here, plaintiff fails to meet his burden.

Plaintiff requested leave to which the FMLA did not entitle him. Again, the FMLA entitled plaintiff "to a total of 12 workweeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1)(D). Plaintiff first took FMLA leave on August 2, 2017. By April 29, 2018, he had exhausted his allotted FMLA leave for the 12-month period ending August 1, 2018. Before a new 12-month period had started, however, on June 26, 2018, plaintiff requested an extended leave of absence spanning June 25 to July 16. To the extent plaintiff made that leave request "[f]or his own medical care," (Doc. 68-5, at 2), the FMLA conferred plaintiff no right to his requested leave. *See Valdez*, 462 F. App'x at 816, 819–20

---

App'x 814, 822 (10th Cir. 2012) ("'A retaliation claim may be brought when the employee successfully took FMLA leave . . . and was adversely affected by an employment action based on incidents *post-dating* [his] return to work.' When, however, an employee is denied restatement following leave, the claim is properly characterized as an interference claim." (emphasis added)). Even understood as an interference claim, however, plaintiff still must and still does not show evidence of an adverse action. *See Valdez*, 462 F. App'x at 820 ("To establish an FMLA interference claim, [plaintiff] must show . . . [defendant's] adverse action interfered with his right to take FMLA leave").

(affirming summary judgment on employee's FMLA interference claim where employee "ad exhausted his twelve weeks of FMLA leave" prior to additional leave requests).  And to the extent plaintiff based that leave request on the nonmedical need "to handle [his deceased mother's] affairs," (Doc. 68-5, at 2), accommodating such need is not a "right provided under [the FMLA];" so, any interference with that request states no actionable FMLA interference claim. 29 U.S.C. § 2615(a)(1).

Because plaintiff's presented claims for FMLA retaliation and interference lack necessary support, summary judgement must be for defendant.

_____

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. 60) is granted in part and denied in part.  Defendant's motion is granted as to plaintiff's ADA hostile work environment and retaliation claims, as well as plaintiff's FMLA retaliation and interference claims.  But as to plaintiff's ADA failure-to-accommodate claim, defendant's motion is denied.

Dated December 10, 2019, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**

-25-